104 N.J. Super. 88 (1968)
248 A.2d 570
IN THE MATTER OF DISCIPLINARY PROCEEDINGS AGAINST OFFICER LEONARD GIOGLIO, JR.
Superior Court of New Jersey, Middlesex County Court.
Decided December 16, 1968.
*91 Mr. Gabriel Kirzenbaum for Officer Gioglio.
Mr. Joseph F. Bradshaw for City of New Brunswick.
HEINE, J.S.C. (temporarily assigned).
This is an appeal by Leonard Gioglio, Jr., a police officer of the City of New Brunswick, pursuant to N.J.S.A. 40:47-10, to review his conviction after hearing upon written charges preferred by the chief of police. Two charges were preferred:
*92 (1) Insubordination and absence without leave in that he failed to report for duty in uniform, as directed, at 9 P.M., July 15, 1968. (This charge was claimed to be in violation of sections 2 and 4 of the Police Rules and Regulations.)
(2) Breach of discipline in that he granted an interview to a newspaper reporter which was published in the Daily Home News on July 15, 1968. (This charge was claimed to be in violation of section 50 of the Rules and Regulations.)
In defense of the charges Gioglio now contends that
(a) The rules and regulations are invalid because they were adopted by resolution and not by ordinance of the board of commissioners (New Brunswick is governed by a board of commissioners operating under the provisions of N.J.S.A. 40-70-1 et seq.)
(b) As to the first charge, his absence was excusable
(c) As to the second charge, the rule is too vague and, therefore, unenforceable
(d) The rule violates his constitutional right of freedom of speech guaranteed by the First Amendment.
The court finds the following facts:
On May 26, 1967 the chief of police issued and served on Gioglio an order requiring him to return to duty with the uniformed patrol effective Monday, May 29, 1967. Upon receipt of this order Gioglio went to Commissioner Valenti, Director of the Department of Public Safety, and discussed with him the continuation of his assignment on a special detective squad. Commissioner Valenti conferred with the chief of police and as a result the order was withdrawn. Later on the chief discussed with the director the need for more officers in uniform to meet the increase in crimes of violence on the streets, with the result that Gioglio was ordered by the chief to report in uniform for patrol duty, commencing with the 9 P.M. shift on July 1, 1968. The order indicated that it was a temporary assignment. This order was not complied with because previous to the date thereof Gioglio *93 was given permission by his captain to take his vacation from July 1 to July 15.
On July 12 Gioglio received an order from the Chief to report in uniform to the lieutenant in charge of the 9 P.M. shift on Monday, July 15, for assignment to patrol duty. The assignment was to continue until further notice. Immediately after receipt of the order Gioglio again went to Director Valenti to complain about it. The director advised him that he was aware of the order, it was issued with his consent and that it should be obeyed. Gioglio complained about being required to return to patrol duty and said he would fight the order. He left the director with the impression that he would not obey the order.
On July 14 Gioglio wrote to the director stating that he had accumulated approximately 500 hours of overtime work in the course of his special detective work assignment and requested that he be given leave effective July 15 for this accumulated time, so that he could pursue opportunities for employment elsewhere. He was careful to state that the letter was not to be construed as a resignation. This would come if his pursuits bore fruit. The director turned the letter over to the chief, who responded in writing denying the request for leave and pointed out that plainclothesmen had never been granted leaves of absence to compensate for accumulated hours of overtime work.
On July 15, at about 8:40 P.M., Gioglio called police headquarters on the phone, spoke to the police dispatcher and advised him that he was not reporting for work. When asked by the dispatcher whether he was reporting off as sick, Gioglio replied, "No, I am just reporting off."
The next evening Gioglio appeared at the meeting of the board of Commissioners to complain publicly against the chief of police. While there he allowed himself to be interviewed by a reporter of the Daily Home News. The next day he issued a written statement to the press.

*94 Police Rules and Regulations

As far as I can find, our courts have not specifically passed upon the question of whether the rules or regulations governing a police department can only be adopted by ordinance and not by resolution. The question was expressly by-passed by our Supreme Court in Borough of Jamesburg v. Hubbs, 6 N.J. 578, 584, 585 (1951). Cf. Alcutt v. Board of Police Comm'rs. of Trenton, 66 N.J.L. 173 (Sup. Ct. 1901), affirmed 67 N.J.L. 351 (E. & A. 1902); Hofbauer v. Board of Police Comm'rs. of City of East Orange, 133 N.J.L. 293 (Sup. Ct. 1945). But see Antonelli Construction, Inc. v. Milstead, 34 N.J. Super. 449, 456 (Law Div. 1955).
N.J.S.A. 40:47-1 provides,
"The governing body of every municipality may make, amend, repeal and enforce ordinances to establish, maintain, regulate and control a police department and force, and subject to the provisions of articles 3 of this chapter (§ 40:47-21 et seq.), a paid fire department and force therein; to prescribe and establish rules and regulations for the government and discipline thereof; the appointment, terms and removal of the officers and members thereof, and to prescribe their duties and fix their compensation."
The present rules and regulations governing the police department were adopted on March 3, 1925 by resolution of the board of commissioners. They were published in printed book form and presumably distributed to all present members of the police force.
The original ordinance establishing the New Brunswick police department was enacted in 1902. By ordinance adopted August 4, 1925 that ordinance was amended to provide for an enlarged police force. Section 2 thereof provided, among other things:
"The Detective Lieutenants, Lieutenants, Sergeants and Patrolmen shall severally perform the duties imposed upon them respectively by the ordinances, orders, rules and regulations as have been or may, *95 from time to time, be adopted for the government and control of the Police Department."
The city now contends that assuming the rules and regulations can only be adopted by ordinance and not by resolution and, therefore, are of questionable validity, they nevertheless had new life breathed into them by the amendatory ordinance of August 4, 1925. It argues that the rules and regulations were incorporated in the amendatory ordinance by reference and, therefore, satisfied the statutory requirement.
The validity of the enactment of the rules and regulations need not be resolved in this case.

Charge of Failure to Report for Duty
The first charge against Gioglio accuses him of insubordination and absence without leave in that he failed to report for duty in uniform as directed by his Chief.
"The finding of misconduct need not be predicated upon the violation of any particular regulation or rule." Asbury Park v. Dept. of Civil Service, 17 N.J. 419, 429 (1955); In re Emmons, 63 N.J. Super. 136, 140 (App. Div. 1960).
The order to report for duty is, in the opinion of the court, not such a rule or regulation as is within the intendment of N.J.S.A. 40:47-1. That section has reference to rules and regulations of general tenor and application and does not apply to an order to work a special assignment of indefinite duration. Borough of Jamesburg v. Hubbs, 18 N.J. Super. 5, 11 (App. Div. 1952). A police officer is not free to choose his working hours. He may not accept the benefits entirely discharged from the burden of his employment. Id., at p. 9.
I cannot accept Gioglio's belated excuse that he failed to report for duty because he was distraught by reason of the events that occurred on the afternoon of July 15. If he was neither physically nor mentally fit for duty that evening, he could very easily have informed headquarters when he called *96 to report "off" that he reported "off" because of illness. When he called headquarters to report "off" he was specifically asked whether he was reporting off "sick" and he replied, "No, I am just reporting off."
In my opinion, his failure to report for duty was willful. It was consistent both with his attitude expressed several days before that he intended to fight the order, and the impression he left with the director of the department that he did not intend to obey the order. This attitude is supported by the fact that the next evening, rather than attempting to make amends for his disobedience, he appeared at the meeting of the board of commissioners for the purposes of castigating the police chief and furthering his claim for paid time-off in lieu of compensation for overtime worked.
A police department is a military-type organization. City of Newark v. Massey, 93 N.J. Super. 317, 323 (App. Div. 1967); Klein v. Civil Service Comm'n. of Cedar Rapids, 152 N.W.2d 195, 200 (Iowa Sup. Ct. 1967). Discipline must be enforced. An officer does not have the unbridled right to determine in his own mind whether a given order or assignment of duty should or should not be obeyed. This would lead to an entire breakdown in discipline and morale that could have very unfortunate results.
The conviction on the first charge is affirmed.

Charge of Interview and Statement to Newspaper
As to the second charge, we have a different problem. Here, Gioglio is charged with a breach of the rules and regulations in that he granted an interview to a newspaper reporter that was published.
Rule 50, claimed to have been breached, provides as follows:
"It will be regarded a breach of discipline for an officer of the Police Department to prepare or publish an interview or subject himself to be interviewed on any business pertaining to the Police Department, except by permission of the Director of the Department of Public Safety or the Chief of Police."
*97 Assuming arguendo that the rules and regulations were properly adopted, that is, incorporated into the ordinance of August 4, 1925, and hence sufficiently complied with the requirement of N.J.S.A. 40:47-1, it is contended that they violate the right of free speech guaranteed by the First Amendment of the Federal Constitution and are too vague to be enforceable.
The general rule is now well established that an authorized governmental body may adopt reasonable rules or regulations for the government and discipline of the members of a police department to the end that such members may not be allowed to disrupt or impair the public service. Alcutt v. Board of Police Comm'rs. of Trenton, supra; Hofbauer v. Board of Police Comm'rs. of City of East Orange, supra; see cases collected in the annotations, 91 L.Ed. 787 (1947) and 163 A.L.R. 1358 (1946); and, in addition Klein v. Civil Service Comm'n. of Cedar Rapids, supra; Riley v. Board of Police Comm'rs of City of Norwalk, 147 Conn. 113, 157 A.2d 590 (Sup. Ct. Err. 1960); DeGrazio v. Civil Service Comm'n of City of Chicago, 31 Ill.2d 482, 202 N.E.2d 522 (Sup. Ct. 1964); Flood v. Kennedy, 12 N.Y.2d 345, 239 N.Y.S.2d 665, 190 N.E.2d 13 (Ct. App. 1963); Hayman v. City of Los Angeles, 17 Cal. App.2d 674, 62 P.2d 1047 (D. Ct. App. 1936); Board of Education of City of Los Angeles v. Swan, 41 Cal.2d 546, 261 P.2d 261 (Sup. Ct. 1953).
While one employed in the public service does not have a constitutional right to such employment, McAuliffe v. Mayor, etc., of the City of New Bedford, 155 Mass. 216, 29 N.E. 517, 518 (Sup. Jud. Ct. 1892); Board of Education of City of Los Angeles v. Swan, supra; Belshaw v. City of Berkeley, 246 Cal. App.2d 493, 54 Cal. Rptr. 727 (D. Ct. App. 1966), he cannot be removed or suspended from his public employment in disregard of his constitutional right. Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952); Keyishian *98 v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); Fort v. Civil Service Comm'n. of County of Alameda, 61 Cal.2d 331, 38 Cal. Rptr. 625, 392 P.2d 385 (Sup. Ct. 1964). In DeStefano v. Wilson, 96 N.J. Super. 592, 598 (Law Div. 1967), the court struck down a fire department rule or regulation prohibiting political activity which it held to be akin to free speech protected by the First Amendment.
The privilege of public employment and the right of free speech are not incompatible, nor are they mutually exclusive. Belshaw v. City of Berkeley, supra. The public employee may speak freely so long as he does not impair the administration of the public service in which he is employed. City of St. Petersburg v. Pfeiffer, 52 So.2d 796 (Fla Sup. Ct. 1951); Belshaw v. City of Berkeley, supra; cf. Hildebrandt v. Bailey, 65 N.J. Super. 274 (App. Div. 1961).
The newspaper account mainly concerned itself with Gioglio's request for 500 hours of time off to compensate him for claimed overtime previously worked and the director's response that the established policy of the department was not to give plainclothesmen accumulated time off because of such an understanding when an officer goes to plainclothes duty. The newspaper story makes one reference to the fact that Gioglio claimed "discontent in the police department, criticized the abilities of superior officers in certain situations." The claims are not documented nor supported by any factual detail or any specifics to which they may relate.
In Wood v. Georgia, 370 U.S. 375, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962), Chief Justice Warren, speaking for the court, said,
"Men are entitled to speak as they please on matters vital to them; errors in judgment or unsubstantiated opinions may be exposed, of course, but not through punishment for contempt for the expression. Under our system of government, counterargument and education are the weapons available to expose these matters, not abridgement of the rights of free speech and assembly."
*99 Even if it be conceded that a newspaper story such as the one here under consideration be considered as critical of the superior officers, there is no showing in this case that its publication impaired or disrupted the public service.
Pickering v. Board of Education, supra, further held that statements by public officials on matters of public concern must be accorded First Amendment protection despite the fact that the statements are directed at their nominal superiors, citing Garrison v. Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964); Wood v. Georgia, supra.
"The burden is upon the governing body to show that there is a compelling public interest which warrants the restriction of First Amendment rights. In the absence of such a showing, these rights are not subject to impairment or destruction. Thomas v. Collins, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430 (1945); Bates v. City of Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960); NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); Gibson v. Florida Legislative Investigation Committee, 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963)." DeStefano v. Wilson, supra, at p. 599.
To which may be added Belshaw v. City of Berkeley, supra, and the cases therein cited.
In Pickering the court recognized that the problem for the court in any case is to arrive at a balance between the interests of the public officer or public employee, as a citizen, in commenting upon matters of public concern, and the interest of the state or local government, as an employer, in promoting the efficiency of the public services it performs through its employees. In Wood v. Georgia, supra, the United States Supreme Court weighed the balance in terms of the clear and present danger standard. The court said:
"[O]ut-of-court publications were to be governed by the clear and present danger standard described as `a working principle that the substantive evil must be extremely serious and the degree of imminence extremely high before utterances can be punished'."
*100 It may be argued that a vice of the rule or regulation here under consideration is that in its vagueness it proscribes the officer from preparing or publishing an interview on any business pertaining to the police department without permission of the chief of police or director of the department, and without regard to the contents of such publication or its effect upon the administration of the public service. An officer could be charged with the violation of this rule even though the interview was laudatory or complimentary of the operation of the department. The blanket proscription is tantamount to a total denial of an officer's right to free speech. So regarded, it may be violative of both the First and Fourteenth Amendments.
"The basic principal is that a statute is bad if it `either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application' Connally v. General Construction Co., 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322, 328 (1926)." State v. Smith, 46 N.J. 510, 518 (1966)
This is not to say that the rule or regulation cannot be drawn in broad terms, provided it is controlled by a sufficient basic norm or standard. It need not be minutely detailed to cover every possible situation. Moyant v. Borough of Paramus, 30 N.J. 528, 553 (1959); Ward v. Scott, 11 N.J. 117, 123, 124 (1952). It would be sufficient if the rule or regulation provided a standard merely in terms that would proscribe such statements or interviews pertaining to the police department that impair the public service or improperly interfere with the due administration of criminal justice. Such activity would undoubtedly constitute conduct unbecoming a police officer, warranting discipline at the hands of the proper authorities. Cf. State v. Van Duyne, 43 N.J. 369, 389 (1964).
However, constitutional questions should not be resolved unless absolutely imperative in the disposition of the *101 litigation; Ahto v. Weaver, 39 N.J. 418, 428 (1963); State v. Salerno, 27 N.J. 289, 296 (1958).
Certainly in this type of proceeding, where this court is sitting only as a statutory tribunal to review the conviction in the departmental proceedings by the Director of Public Safety, and not by reason of any constitutional or inherited common law jurisdiction, the court should confine itself to an affirmance or reversal of such conviction below. Borough of Jamesburg v. Hubbs, supra, 6 N.J., at p. 582 (1951); City of Wildwood v. Neiman, 44 N.J. Super. 209, 212 (App. Div. 1957); N.J.S.A. 40:47-10. In this type of review this court, in the face of its findings as to the second charge, will not assume to pass upon the constitutionality of the rule or regulation in question. State v. Salerno, supra. Cf. Hildebrandt v. Bailey, supra.
The court finds no objectionable comments in the newspaper account of Gioglio's interview or in his statement to the press.
I conclude that the newspaper article containing Gioglio's statement represents nothing more than an exercise of his constitutionally protected right of free speech for which, in the absence of a showing that his conduct impaired the public service, he cannot be punished under the rules or regulations of the police department, assuming their valid enactment. There is not the slightest proof Gioglio's statement or interview impaired the administration of the public service of the department of which Gioglio was a member. The conviction on this charge is reversed.
The sentence of this court is that Leonard Gioglio, Jr., on the first charge, be suspended from duty, without pay, for a period of four months from July 15, 1968.